UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LISA WALLACE,

                Plaintiff,

    v.

MCCABE, WEISBERG & CONWAY, P.C.,
TERRENCE J. MCCABE, MARC WEISBERG,
and EDWARD CONWAY, Jointly and Severally,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

<u>ECF CASE</u>

No.: _____

COMPLAINT

<u>JURY TRIAL DEMANDED</u>

<u>NATURE OF ACTION</u>

1.    This is an action to remedy discrimination on the basis of gender for Defendants McCabe, Weisberg & Conway, P.C. (the "Firm"), Terrence J. McCabe, Marc Weisberg and Edward Conway's failure to pay male and female employees equal wages, violating the Equal Pay Act, 29 U.S.C. §206(d), and the New York State Labor Law § 194.

2.    This action is also to remedy familial-status based discrimination in violation of the New York State Human Rights Law. N.Y. Exec. Law §§ 296.1, 292(26).

3.    Plaintiff Lisa Wallace seeks compensatory, liquidated and punitive damages, the benefits she was denied, injunctive and declaratory relief, and appropriate legal and equitable relief.

<u>JURISDICTION AND VENUE</u>

4.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the EPA, 29 U.S.C. § 216(d). This Court has supplemental jurisdiction over Wallace's Labor Law and Human Rights Claims under 28 U.S.C. § 1367.

5.      Venue is proper in this district under 28 U.S.C. §1391(b)(2) because the Firm transacts a substantial portion of its business in this District, Plaintiff worked primarily in this District, and Defendants committed the unlawful employment practices at issue in this District.

6.      This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

<u>THE PARTIES</u>

7.      Plaintiff Wallace resided in New York from 1999 to 2004 and has resided in Connecticut since 2004.

8.      The Firm is a Professional Corporation that is organized and existing under the laws of the Commonwealth of Pennsylvania, and is licensed to and does business in the State of New York.

9.      Upon information and belief, the Firm is an enterprise engaged in commerce or in the production of goods for commerce. It has engaged in commerce or in the production of goods for commerce, because, *inter alia*, it has employees that handle goods and materials that have been produced for and moved in commerce, and, upon information and belief, its annual gross volume of business is at least $500,000.00. These goods and materials that have been produced for and moved in commerce, which its employees have handled, include, but are not limited to, computers and paper.

10.      Each Defendant, individually or jointly, has employed Plaintiff Wallace, as each controlled her work schedule and employment conditions, determined her payment rate and method, and kept at least some records regarding her employment.

<u>STATEMENT OF FACTS</u>

11.      Women continue to encounter the "glass ceiling" at law firms. A recent American Bar Association study found that at law firms nationwide, female attorneys comprise 44.7% of law firm associates, but only 18% of equity partners.[1] In the last decade, law firms have made almost no progress towards increasing women's representation among the ranks of equity partners: the current 18% figure is only 2% higher than the 16% rate in 2006.[2]

12.      The Firm represents mortgage lenders, banks, mortgage services and financial institutions, and it has 7 offices: Philadelphia, Pennsylvania; Westmont, New Jersey; Laurel, Maryland; Lessburg, Virginia; New Rochelle, New York; Melville, New York; and Wilmington, Delaware.

13.      The Firm has existed for approximately 40 years.

14.      During those 40 years, there have only been two female partners, and one of those two became partner only because her firm was acquired and she insisted on becoming a partner as a condition of the transaction (Laura O'Sullivan). The other female partner (Margaret Gairo) had a disproportionately lower number of shares relative to the male shareholders.

15.      The Firm's male-dominated culture creates an environment where gender stereotypes flourish. This culture drives the decisions on promotions and compensation. It is a culture where females hold positions of managing attorneys in the offices, but are not

---

[1] Commission on Women in the Profession, American Bar Association, *A Current Glance at Women in the Law 2016* (May 2016), *available at* http://www.americanbar.org/groups/women/resources/statistics.html.
[2] National Association of Women Lawyers, *Women Lawyers Continue to Lag Behind Male Colleagues:*
[2] National Association of Women Lawyers, *Women Lawyers Continue to Lag Behind Male Colleagues: Report of the Ninth Annual NAWL National Survey on Retention and Promotion of Women in Law Firms* (2015), *available at* http://www.nawl.org/p/cm/ld/fid=506.

permitted to advance their careers by obtaining equity partnership. When partnership opportunities were finally made available in late 2016, female attorneys were offered the available shares at extremely unfavorable financial terms enriching the male partners as they retire from the Firm.

16.     Wallace received her *Juris Doctorate* from St. John's University School of Law in 2000 and has 16 years experience representing mortgage lenders, banks, mortgage services and financial institutions.

17.     Wallace began her employment with the Firm in 1999 at its Manhattan office as a part-time law clerk and was promoted to "Managing Attorney" in 2001. She briefly left the Firm in 2004 but returned as a consultant in 2005 and then became a full-time employee again in 2007 as the New Rochelle office's "Managing Attorney" and in 2013 also assumed the "Managing Attorney" role for the Melville, New York office. She primarily worked out of the New Rochelle office.

18.     When her employment was terminated in November 2016, Wallace held the position of "Managing Attorney," and she had no shares in the Firm's profits.

19.     In August 2016, the Firm extended an offer to Wallace to formally join the Firm as a "shareholder" or equity partner by purchasing a certain percentage of the Firm's equity, the terms of which were financially unsound to the point the Firm could not have reasonably expected her to accept them.

20.     After she rejected the August 2016 offer, on or about November 2, 2016, the Firm verbally offered Wallace the opportunity to purchase a smaller percentage of the Firm's equity (with modified finance terms). As a condition of this offer, Defendants

stated she could no longer work from home on Fridays – even though she had done so for 8 years.

21.     During a November 6, 2016 teleconference, Wallace expressed to O'Sullivan the difficulties in arranging to come into the office on Fridays. O'Sullivan stated she would discuss this issue with the other partners the following day and would advise Wallace on the decision.

22.     The next time O'Sullivan discussed with Wallace the issue of her working from home on Fridays was when Gairo and O'Sullivan appeared in the New Rochelle office to terminate Wallace's employment on November 29, 2016.

23.     The New Rochelle office has approximately 21 lawyers and 140 legal assistants.

24.     Wallace was the most experienced attorney in the New Rochelle office. It is only because of her experience that the office in 2011 was permitted to become Freddie Mac certified and later Fannie Mae certified, enabling the Firm to receive matters from these clients. As a condition to certification, both Freddie Mac and Fannie Mae require the managing attorney of an office have an attorney with at least 8-10 years of experience in foreclosure law.

25.     Wallace contributed as much, if not more, effort than the Firm's partners. While the Pennsylvania office benefited from four partners sharing the office's functions and burdens, Wallace was solely responsible for the New York office's functions and burdens. The Firm's partners rarely, if ever, visited the New York office. O'Sulivan, for example, last appeared in the New Rochelle office 9 years ago.

26.     Wallace had total responsibility over the New Rochelle and Melville offices. At times, her New York offices housed more staff and files than the other Firm offices.

27.     Wallace's responsibility level was equal to the Firm's partners: she attended all client and investor audits and visits to New York independently; Wallace hired, fired and promoted employees; she determined salaries, raises, positions, department structures; she found and engaged in negotiations for leases of office real estate; she had sole discretion to handle and manage the office's case load; she engaged in and effectuated settlements; and she handled strategy on high profile cases.

28.     All of the Firm's offices operated under centralized management: they all used the same employee handbook; McCabe, Weisberg, Conway and Gairo are housed in the Pennsylvania office; and the Human Resources, Compliance, Billing, Federal Bankruptcy and IT Departments are located in the Pennsylvania office. The Pennsylvania office is the hub of the Firm.

29.     From 2011 until her employment was terminated, Wallace handled the highest number of files and staff per individual attorney, including partners, within the Firm.

30.     Wallace and the New York office typically outperformed the Firm's partners and the remaining offices on objective evaluation criteria, including caseload, number of staff members managed, billings, revenues collected, billable hours, fee realization and other criteria.

31.     Since at least 2013, the Firm's male shareholders have been paid far in excess of Wallace.

32.     McCabe, Weisberg and Conway controlled all significant aspects of the Firm's operations, including executive compensation decisions and whom to make partner.

33.     Since at least 2008, Defendants listed Wallace as a "shareholder" on the Firm's website and in the Firm's employee handbook.

34.     In communicating with clients, Defendants referred to Wallace as their "partner," violating New York Disciplinary Rule 2-102 (c).

35.     The Firm's partners had made approximately only six visits to the New Rochelle office since it opened.

36.     In holding her out as a "shareholder" and "partner," and in treating her as a "shareholder," Defendants confirmed they consider her to be their peer in terms of duties, skill, effort and responsibility.

<u>Familial Status Discrimination</u>

37.     Wallace is a mother of three and is a caregiver to them, as she provides direct and ongoing care for her minor children who live in her house.

38.     Defendants know that Wallace is a mother of three, including a three-year old.

39.     For the past eight years, Wallace has worked in the office Monday to Thursday and at home on Fridays. She worked under this arrangement to care for her children.

40.     Defendants have previously permitted and continue to permit other employees to work from home including, for example, the Firm's Director of Operations.

41.     Up until her employment was terminated, nobody questioned Wallace's presence in the office, her overall availability or her capacity as a skilled attorney.

42.     Up until her employment was terminated, no Firm partner or client raised any issues with Wallace about her working arrangement. Regardless of the day or time, Wallace attended internal and external conference calls, reviewed weekly work agenda items and generated and respond to emails.

43.     Knowing she is a caregiver for her minor children and needed to work from home on Fridays to care for her children, with their November 2016 equity offer, Defendants changed their policy to require Wallace to work in the office, knowing she could not work under this new policy.

44.     Defendants' decision to require Wallace to work in the office on Fridays was made because she is a parent of minor children.

45.     Defendants changed their policy to require Wallace to work in the office with the hope it would force her to quit or, alternatively, give them – what they incorrectly thought to be – a lawful basis for firing her.

46.     Defendants terminated her employment on November 29, 2016 because she is a caregiver who would not work in the office on Fridays.

47.     In a November 28, 2016, 4:12 p.m. email, O'Sullivan asked Wallace what she had decided on the smaller equity offer, specifically calling attention to the contingent requirement of working at the office on Fridays.

48.     The November 28, 2016, 4:12 p.m. email was an effort to conceal the discriminatory decision to terminate Wallace's employment.

49.     The Firm had decided to terminate Wallace's employment prior to the November 28, 2016, 4:12 p.m. email being sent.

50.     Prior to the November 28, 2016, 4:12 p.m. email, some New York staff members were advised that Wallace would be terminated the following day.

51.     Prior to sending the November 28, 2016, 4:12 p.m. email, the Firm's Director of Operations had already scheduled a visit to the New Rochelle office to deactivate Wallace's account.

52.     Following the termination of her employment, Wallace suffered and continues to suffer from emotional distress, including stress, anxiety, headaches and sleepless nights.

53.     Defendants controlled the terms of Wallace's employment, including her salary, hiring her and firing her.

FIRST CAUSE OF ACTION

VIOLATIONS OF EQUAL PAY ACT AS AGAINST ALL DEFENDANTS

54.     Wallace repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

55.     Wallace asserts this claim under the Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. § 206(d).

56.     Defendants have discriminated against Wallace within the meaning of the EPA, 29 U.S.C. §§206, *et seq.* by providing her lower pay than similarly situated male colleagues on the basis of her gender, even though Wallace performed similar duties requiring the same skill, effort and responsibility as the Firm's male shareholders (McCabe, Weisberg and Conway).

57.     Wallace and the Firm's male shareholders (McCabe, Weisberg and Conway) performed similar job duties and functions, which required the same skill, effort and responsibility.

58.     Wallace and the Firm's male shareholders (McCabe, Weisberg and Conway) performed under similar working conditions.

59.     Defendants discriminated against Wallace by subjecting her to discriminatory pay, violating the EPA.

60.     The difference in pay between the Firm's male shareholders (McCabe, Weisberg and Conway) and Wallace was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

61.     Defendants caused, attempted to cause, contributed to or caused the continuation of pay discrimination based on gender, violating the EPA.

62.     Defendants willfully violated the EPA within the meaning of 29 U.S.C. § 255(a). Because of these willful violations, a three-year statute of limitations applies to the violations under 29 U.S.C. § 255.

63.     Because of Defendants' willful violations, Wallace is entitled to all legal and equitable remedies, including lost earnings, liquidated damages, interest, attorneys' fees and expenses and other compensation under 29 U.S.C. § 216(b).

<u>SECOND CAUSE OF ACTION</u>

VIOLATIONS OF THE NEW YORK LABOR LAW, AS AMENDED BY THE WOMEN'S EQUALITY ACT

64.     Wallace repeats and realleges each and every allegation of the preceding paragraphs as if fully set forth herein.

65.     Wallace is an employee as defined under N.Y. Lab. Law § 190(2).

66.     Defendants are employers as defined under the N.Y. Lab. Law §§ 190, 196-d, 651(5), 652 and employed Wallace.

67.     Defendants compensated Wallace less than the Firm's male shareholders (McCabe, Weisberg and Conway) based on her gender, even though Wallace performed similar duties requiring the same skill, effort and responsibility as them, violating. N.Y. Lab. Law § 194.

68.     Wallace and the Firm's male shareholders (McCabe, Weisberg and Conway) performed similar job duties and functions.

69.     Defendants discriminated against Wallace by subjecting her to discriminatory pay, violating the Labor Law.

70.     The difference in pay between the Firm's male shareholders (McCabe, Weisberg and Conway) and Wallace was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

71.     Defendants caused, attempted to cause, contributed to or caused the continuation of pay discrimination based on gender, violating the Labor Law.

72.     Defendants willfully violated the Labor Law, entitling her to 300% of the unpaid wages. N.Y. Lab. Law §198.1-a.

73.     Because of Defendants' violations, Wallace is entitled to all legal and equitable remedies, including lost earnings, liquidated damages, interest, attorneys' fees and expenses and other compensation. N.Y. Lab. Law § 198.

THIRD CAUSE OF ACTION

FAMILIAL STATUS DISCRIMINATION UNDER THE NEW YORK STATE
HUMAN RIGHTS LAW AS AGAINST ALL DEFENDANTS

74.     Wallace repeats and realleges each and every allegation of the preceding
paragraphs as if fully set forth herein.

75.     At all relevant times, Wallace was an "employee" and "person" within the
meaning of the NYSHRL and Defendants were "employers."

76.     Wallace constitutes a caregiver under the NYSHRL, N.Y. Exec. Law §§
296.1, 292(26).

77.     The NYSHRL prohibits employment discrimination based on familial
status.

78.     Defendants terminated Wallace's employment because of her familial
status, violating the NYSHRL.

79.     McCabe, Weisberg and Conway are personally liable for the damages
under this claim because they constitute "employers" and/or participated in the conduct
giving rise to this discrimination claim. N.Y. Exec. Law §§ 296(1), 296(6).

80.     As a result of Defendants' discriminatory termination of her employment,
Wallace has suffered and continues to suffer, *inter alia*, loss of wages, emotional distress,
mental anguish, emotional pain, physical pain and suffering, inconvenience, loss of
enjoyment of life and medical expenses.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wallace respectfully requests this Court grant the
following relief:

a.     A declaratory judgment that the practices complained of herein are unlawful under the EPA;

b.     An award of back pay, front pay, liquidated damages, lost benefits, and other damages for lost compensation Wallace suffered to be determined at trial;

c.     An award of punitive damages;

d.     An award of prejudgment and post-judgment interest;

e.     An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

f.     Such other and further relief as this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Wallace demands a trial by jury on all questions of fact the Complaint raises.

Dated:  New York, New York
        February 2, 2017

BRONSON LIPSKY LLP


s/ Douglas B. Lipsky
Douglas B. Lipsky
630 Third Avenue, Fifth Floor
New York, New York 10017-6705
Phone: 212.392.4772
Fax: 212.444.1030
dl@bronsonlipsky.com